# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA CHARLESTON DIVISION

JONAVIEVE LOCKHART, Executrix
for the Estate of BARRY D.
LOCKHART, Deceased,

CIVIL ACTION NO.:___2:21-cv-00018

Judge:_____

                          Plaintiff,

v.

E. I. DU PONT DE NEMOURS AND
COMPANY,

**COMPLAINT FOR MONEY
DAMAGES (JURY DEMAND
ENDORSED HEREON)**

                          Defendant.

## COMPLAINT

Plaintiff, Jonavieve Lockhart, Executrix of the Estate of Barry D. Lockhart

("Plaintiff"), by and through the undersigned counsel, states as follows for Plaintiff's

Complaint against defendant E. I. du Pont de Nemours and Company ("DuPont" or

"Defendant"):

## NATURE OF ACTION

1.      This action is brought pursuant to West Virginia Code § 55-7-5 and § 55-7-6

on behalf of the statutory beneficiaries of Barry D. Lockhart (hereinafter referred to as

"Plaintiff-decedent"), who was injured by Defendant E. I. du Pont de Nemours and Company

(hereinafter referred to as "Defendant") and subsequently died as a result of defendant's

intentional, malicious, knowing, reckless, and/or negligent acts and/or omissions in connection

with contamination of human drinking water supplies used by Plaintiff-decedent.

2.      At all relevant times, Defendant owned, operated, maintained, managed

and/or otherwise controlled a manufacturing facility in Wood County, West Virginia, known

as the "Washington Works Plant." (hereinafter referred to as "Plant").

3.     As a result of Defendant's negligent, improper, inadequate, inappropriate and/or otherwise unlawful conduct in its ownership, operation, maintenance, management and/or control of the Plant, Plaintiff-decedent suffered injuries and death for which Plaintiff seeks redress and damages.

4.     Consequently, Plaintiff seeks compensatory and punitive damages, costs incurred and to be incurred by Plaintiff and Plaintiff-decedent, and any other damages that the Court or jury may deem appropriate, as a result of Defendant's conduct, which caused Plaintiff-decedent to suffer from kidney cancer and death, as well as other severe and personal injuries during his lifetime, which were permanent and lasting in nature, physical pain and mental anguish during his lifetime (including diminished enjoyment of life).

## JURISDICTION AND VENUE

5.     DuPont is a Delaware corporation authorized to conduct business in the State of West Virginia and has a principal place of business at 1007 Market Street, Wilmington, Delaware 19898.

6.     DuPont's acts and/or omissions at the Plant have harmed Plaintiff-decedent in Wood County, West Virginia.

7.     Plaintiff is the Executrix of the Estate of Barry D. Lockhart.

8.     Plaintiff-decedent, Barry D. Lockhart, was born on May 22, 1963.

9.     Plaintiff-decedent, Barry D. Lockhart, died on March 26, 2019, as a result of kidney cancer.

10.     The injuries and damages sustained by Plaintiff-decedent, Barry D. Lockhart, were caused by Defendant's acts and/or omissions.

2

11.     This is an action for money damages. This United States District Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332, in that the Plaintiff and Defendant are of diverse citizenship and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

12.     Venue is proper in this Court and district pursuant to 28 U.S.C. § 1391, because Defendant conducts business in Wood County, West Virginia; and the tortious conduct at issue in this case occurred in and around Wood County, West Virginia.

## GENERAL ALLEGATIONS

13.     In connection with its manufacturing operations at the Plant, DuPont used at the Plant since the early 1950s one or more materials that contain, incorporate, include and/or degrade into perfluorooctanoic acid ("PFOA") and/or ammonium perfluorooctanoate (a/k/a C- 8/APFO/PFOA) (hereinafter "C-8").

14.     During the course of its operations at the Plant, DuPont has negligently, recklessly, maliciously, knowingly, carelessly, wrongfully and/or intentionally allowed, caused, and/or otherwise permitted and/or is continuing to so allow, cause, and/or otherwise permit C-8 to be discharged, vented, emitted, and/or otherwise released from the Plant into the environment at, under, and/or surrounding the Plant, including air, soils, sediment, and water, in such a manner as to result in C-8 contamination of human drinking water supplies (the "Releases").

15.     DuPont has been aware since its manufacturing operations at the Plant were constructed that one or more operations and equipment used at the Plant involving C-8 would allow and/or permit Releases, and has knowingly, purposefully, maliciously, intentionally, recklessly, and/or negligently conducted such operations and/or used such equipment

understanding and/or expecting that such Releases would and/or could occur and/or were likely to occur without additional control and/or abatement equipment.

16.      Concerns about the potential toxicity of C-8 had been raised internally within DuPont by at least 1954, leading DuPont's own researchers to conclude by at least 1961 that C-8 was toxic and, according to DuPont's own Toxicology Section Chief, should be "handled with extreme care."

17.      By 1976, DuPont was aware that researchers had reported to have found organic fluorine in samples of human blood from blood banks in the United States, which such researchers believed to be a potential result of C-8 exposure.

18.       By 1978, DuPont's Medical Director was informed by DuPont's C-8 supplier at the time (the 3M Company) that 3M had collected blood samples from its workers exposed to C- 8 and that such workers had organic fluorine in their blood.

19.      In 1978, DuPont's Medical Director authorized a plan to review and monitor the health conditions of DuPont workers potentially exposed to C-8 to assess whether any negative health effects were attributable to that exposure, including obtaining blood samples from those workers and analyzing the blood for organic fluorine content.

20.      In 1978, an article authored by DuPont's Medical Director was published in which he acknowledged that DuPont has a duty to report potential health hazards related to the materials it handles at its manufacturing facilities (the "Article").

21.      In the 1978 Article, DuPont's Medical Director acknowledged that DuPont has a "duty to report health hazards," "should disclose health –hazard information," and should "lay all the facts on the table," as such is "the only responsible and ethical way to go," as "[t]o do less would be … morally irresponsible."

4

22.     In sworn deposition testimony in 2004, DuPont's former Medical Director acknowledged that DuPont's duty to report potential health hazards from materials it uses at its Plant (as previously described in his Article) extends to the communities in which DuPont's plants are located.

23.     By March 1979, DuPont had data suggesting that its workers exposed to C-8 had a significantly higher incidence of various adverse health problems than those workers not so exposed, and that the number of workers exposed to C-8 with abnormal liver function tests was notably higher than in the workers not so exposed.

24.     In 1979, DuPont did not report to any government agency or community near any of its manufacturing facilities handling C-8 the results of its testing of workers exposed to C-8 or the results of its analysis of their health status in comparison with those not so-exposed.

25.     By 1980, DuPont had confirmed internally that C-8 "is toxic," "people accumulate C-8", and "continued exposure is not tolerable."

26.     In 1981, DuPont obtained information indicating that 3M had reported to have found birth defects in the eyes of baby laboratory rats exposed to C-8.

27.     In response to the eye defect findings, DuPont prepared and implemented an internal study in 1981 of its own female employees exposed to C-8 at the Plant to see if any similar eye or facial defects had occurred among babies born to those C-8-exposed employees (the "1981 Plant Pregnancy Study"), noting specifically in its own protocol for the study that the precise purpose of the 1981 Plant Pregnancy Study was to determine if "[p]regnancy outcome among female Washington Works employees is causally related to their occupational exposure to C-8."

28.     In its 1981 Pregnancy Study, DuPont specifically noted that finding "2

malformations in 10 exposed live births is a significantly higher rate than a national rate …

[and] is also significantly higher than a plant rate," and would be considered by DuPont to be a

"statistically significant excess" of such birth defects.

29.     Following its internal 1981 Pregnancy Study protocol, DuPont collected

information, including blood results from female Plant employees and their babies (including

umbilical cord blood) and interviews of such employees by the Plant doctor, which indicated

that two of seven human babies born to female Plant employees exposed to C-8 through

manufacturing operations at the Plant had been born, not only with defects in the area of their

eyes and/or face, but with significantly elevated levels of C-8 in their blood, indicating to

DuPont that C-8 could cross the placenta from C-8-exposed mother to child during pregnancy.

30.     After collecting information indicating that two out of the seven human babies

whose mothers had been exposed to C-8 at the Plant had been born with facial defects, and thus

there was a "statistically significant excess" of such defects according to DuPont's own 1981

Pregnancy Study Protocol designed specifically to assess causality between C-8 exposure and

such harm, DuPont intentionally and purposefully chose not to finalize, publish, and/or

otherwise release and/or disclose the results of that study outside DuPont.

31.     By the end of 1981, DuPont was aware that C-8 likely was being released

from the Plant into the air and that such C-8 air emissions likely were leaving the Plant

boundaries.

32.     In March 1982, DuPont reported to the United States Environmental

Protection Agency ("USEPA") that further analysis by 3M and DuPont suggested that the

eye defects observed in the baby *rats* exposed to C-8 were not caused by the C-8 exposure,

but DuPont failed to disclose or report to USEPA or the public at that time any of the

"causal" results of DuPont's investigation of the *human* babies whose mothers were exposed to C-8 at the Plant.

33.     In November 1982, DuPont's Medical Director noted that DuPont did not have adequate "knowledge of the chronic health effects from long-term exposure to low levels of" C-8, that C-8 "is retained in the blood for a long time," that there "is obviously great potential for current or future exposure of members of the local community from emissions" from the Plant, and recommended that all "available practical steps be taken to reduce this exposure."

34.     In 1984, several male workers at the Plant exposed to C-8 in the work place for a few years complained that their wives were having difficulty conceiving children but DuPont did nothing to investigate the claim.

35.     By 1984, DuPont began a program of secretly collecting samples of tap water reported to be from public drinking water supplies located near the Plant by having Plant employees collect tap samples from local businesses and/or their own homes, and arranged for internal analysis of the samples at DuPont for the purpose of assessing C-8 content.

36.     By 1984, DuPont had developed a methodology for analyzing water samples to assess C-8 content with a 0.6 parts per billion ("ppb") or 600 part per trillion ("ppt") detection limit.

37.     In 1984, DuPont's internal analyses of samples collected from public drinking water supplies located near the Plant indicated to DuPont that C-8 was present in drinking water samples collected from locations supplied by public water sources in both Ohio (from the Little Hocking Water Association ("LHWA")) and West Virginia.

38.     In 1984, DuPont was aware that the impacted LHWA public water supply's well field was located upstream from any effluent discharged to the Ohio River from the Plant but in the general direction of the prevailing wind direction.

39.     In 1984, after obtaining data indicating to DuPont that C-8 was present in the tap water supplied by certain Ohio and West Virginia public water supplies near the Plant, DuPont held a meeting at its corporate headquarters in Wilmington, Delaware, to discuss C-8 issues (the "1984 Meeting").

40.     During the 1984 Meeting, DuPont employees at the meeting noted that technologies existed to further control C-8 emissions from its manufacturing sites and that potential replacement materials existed that could eliminate further C-8 emissions from its manufacturing operations.

41.     During the 1984 Meeting, the DuPont employees at the meeting noted that the issue of what to do on C-8 "is one of corporate image, and corporate liability. Liability was further defined as the incremental liability from this point on if we do nothing as we are already liable for the past 32 years of operation."

42.     During the 1984 Meeting, the DuPont employees at that meeting noted that "legal and medical will likely take the position of total elimination" of C-8 at DuPont.

43.     During the 1984 Meeting, the DuPont employees at the meeting noted that options to eliminate further use or emissions of C-8 at DuPont's manufacturing facilities were not "economically attractive," and decided not only to keep using C-8 but to increase its use at the Plant.

44.     DuPont did not want to discontinue its use of C-8, despite its risks, because such action would have jeopardized approximately $100-$200 million in annual business at

the time.

45.     After the 1984 Meeting, DuPont collected additional water samples from public water sources in the area of the Plant at several points in time between 1984 and 1991 and analyzed those samples to assess C-8 content (the "Additional Water Samples").

46.     The Additional Water Samples indicated to DuPont the presence of C-8 in the water of at least one public water supply located near the Plant during each of the sampling events, including the Lubeck Public Water District ("LPSD"), whose public water supply wells were, at the time, located adjacent to the Plant along the Ohio River, downstream from the Plant's ongoing releases of C-8 into that river.

47.     By at least 1988, DuPont was aware that at least one toxicity study in laboratory rats had found that C-8 exposure was related to increased rates of cancer, including testicular cancer.

48.     Despite DuPont's knowledge of the potential toxicity of C-8, including potential carcinogenicity, DuPont continued throughout the rest of the 1980s and into at least the early 2000s to *increase* its use of C-8 at the Plant and to *increase* the amount of C-8 wastes it discharged into the air from the Plant, directly into the Ohio River from the Plant, and into unlined non-hazardous waste landfills in the vicinity of the Plant and local drinking water wells, which DuPont knew would result in the continuing and increasing release of C-8 into the underlying water table and nearby surface waters.

49.     Rather than disclose to the LPSD or any of its customers that elevated levels of C- 8 had been detected in the LPSD public water supply, DuPont arranged to purchase the LPSD well-field property so that the property would become part of the DuPont Plant site, and facilitated LPSD's move in 1989 to a new location several miles further away from the Plant.

9

50.     After moving the LPSD, DuPont notified its employees to immediately cease all further sampling of the former LPSD wells and to destroy all previously-drawn, unanalyzed LPSD well samples.

51.     By April of 1990, DuPont's own sampling data had confirmed that C-8 was present in part per million levels in the water of the Dry Run Stream into which leachate flowed from the DuPont-owned, unlined Dry Run Landfill in Wood County, West Virginia, where DuPont had purposefully dumped more than 7000 tons of C-8-contaminated sludge originating from the Plant.

52.     Despite DuPont's knowledge of the potential toxicity of C-8, including the confirmed carcinogenic nature of C-8 to animals, DuPont knowingly, intentionally, and purposefully withheld information about the high level of C-8 in the Dry Run stream from the family living next to the Dry Run Landfill who DuPont knew had hundreds of head of cattle drinking from and wallowing in that stream.

53.     In 1991, DuPont adopted an internal Community Exposure Guideline ("CEG") for C-8 in community drinking water of 1 part per billion.

54.     Beginning later in 1991, water samples analyzed by and/or on behalf of DuPont at its own Experimental Station Laboratory from public water supplies in the vicinity of the Plant indicated levels of C-8 well-above 1 ppb, with the highest levels (as high as 3.9 ppb) being found in water from the *new* LPSD well field, now located several miles further away from the Plant.

55.     After finding levels of C-8 in public water supplies near the Plant that were more than *double* or *three times* the CEG developed by DuPont as an internal community exposure safety guideline, DuPont prepared information to disclose such facts to the residents

drinking such contaminated water but then purposefully and intentionally chose not to release and/or otherwise disclose that information outside the company.

56.     Rather than alert the community to the C-8 contaminated water, DuPont decided to try to generate data that would reflect lower C-8 sample results by switching in November 1991 to a new outside laboratory to analyze the water for C-8 content, which laboratory claimed to be able to detect C-8 in water as low as 0.1 ppb (100 ppt) (the ""New Water Method").

57.     At the time DuPont decided to begin using the new outside laboratory for C-8 water analyses using the New Water Method, that laboratory had told DuPont that the New Water Method had surrogate recovery rates that resulted in the reported C-8 results being only approximately 60% of the C-8 actually in the water, so the reported C-8 sample results derived using the New Water Method would need to be corrected to account for the low surrogate recovery rates, otherwise those persons reading the results would be misled into believing that the level of C-8 in the water was significantly lower than it actually was.

58.     Despite being warned that data generated by the new C-8 water analysis methodology would suggest C-8 levels that were significantly lower than the level of C-8 likely present in the water and that such data would have to be clarified and/or corrected to avoid being misleadingly inaccurate, DuPont knowingly, intentionally, maliciously, willfully, wantonly, purposefully, recklessly, and/or negligently failed to make such corrections and/or clarifications when it eventually revealed such data to third parties, including public water suppliers, their customers, and/or governmental entities.

59.     In August 2003, DuPont co-authored a report with USEPA and the West Virginia Department of Environmental Protection ("WVDEP") confirming that air emissions

from the Plant were a source of C-8 found in public water supplies near the Plant, noting specifically that "[a]ir emissions of C-8 from the Washington Works Facility are believed to be the source of C-8 detected in areas of West Virginia located adjacent to the facility and the Local Landfill" and that "[a]ir emissions of C-8 from the [P]lant are believed to be the source for C-8 along the Ohio River upstream of the [P]lant."

60.    DuPont's own outside consultants also confirmed in published, peer-reviewed literature that "particulate deposition from [the Plant] air emissions to soil and the subsequent transfer of the chemical through the soil was determined to be the most likely source of [C-8] that was detected in groundwater at locations off-site" from the Plant.

61.    In 1993, a peer-reviewed study was published of 3M workers exposed to C-8 at a 3M manufacturing facility in Minnesota, reporting that "ten years of employment in exposed jobs was associated with a 3.3. fold increase … in prostate cancer mortality compared to no employment in [C-8] production. … If prostate cancer mortality is related to [C-8, C-8] may increase prostate cancer mortality by altering reproductive hormones in male workers," thus making clear to DuPont by at least 1993 that C-8 was linked to increased cancer rates in C-8- exposed humans.

62.    Throughout the rest of the 1990s, DuPont's own corporate epidemiologists internally tracked the number of cancer cases among Plant employees (while DuPont continued to collect C-8 blood samples from such employees), repeatedly noting increased levels of various forms of cancer, including prostate and kidney cancer, but DuPont intentionally and purposefully chose not to publish or otherwise disclose any of those C-8 blood level or cancer results outside DuPont.

63.    In 1998, members of a family whose cattle were drinking C-8-contaminated

water, unbeknownst to their owners, from the Dry Run Creek sued DuPont in a lawsuit brought in West Virginia federal court, before Judge Joseph R. Goodwin, styled *Tennant, et al., v. E.I. du Pont de Nemours & Co.,* Inc. Civil Action No. 6:99-0488 (S.D. W. Va.) (The "*Tennant* Case"), after DuPont refused to provide any explanation or remedy for the deaths of hundreds of head of the family's cattle and the Tennant family's own developing health problems after exposure to materials in the Dry Run Creek and Landfill.

64.     In 1999, after the Tennant family began pushing DuPont to disclose more detailed information about the identity of the chemicals and materials dumped into the Dry Run Landfill that might be causing the problems with the Tennants' cattle and the family's health, DuPont received data confirming that two of twenty-two monkeys in a laboratory study being funded, in part, by DuPont and 3M to assess effects of C-8 exposure on primates, died, including one monkey receiving the lowest dose of C-8 in the study.

65.     Now increasingly concerned about any revelation of C-8 contamination in the community through discovery in the *Tennant* Case because of the recent monkey study results, DuPont orchestrated a plan to try to persuade the Tennant family that all of the problems being alleged by the Tennants were all the family's own doing, setting up a team of scientists from both DuPont and USEPA, known as the "Cattle Team," whose purpose would be to review all of the relevant data and "scientifically" determine whether the problems with the health of the cattle were associated with anything at the Dry Run Landfill.

66.     Although DuPont knew at the time (but had not disclosed) that massive amounts of C-8 were in the Dry Run Landfill, knew that C-8 was present in the Dry Run Stream that the Tennants' cattle were consuming at levels *more than 100 times* DuPont's own 1 ppb safety guideline for human consumption, and had appointed to the Cattle Team at least

one long-time DuPont scientist and veterinarian, who was well aware of C-8 and its potential

toxicities, DuPont never disclosed or mentioned to any of the USEPA members of the Cattle

Team that C-8 might be a contaminant of interest.

67.     DuPont purposefully and intentionally allowed and encouraged the Cattle Team

to perform its "scientific" investigation without ever considering C-8 and without taking any

samples or collecting or preserving any data regarding the potential impact of C-8 on the cattle,

resulting in the generation of a final Cattle Team report in December of 1999, that did not

identify any chemical-related problems and essentially blamed all of the problems on the

Tennant family's own herd management practices.

68.     By at least May of 2000, DuPont had learned that the manufacturer of the C-8

used by DuPont at the Plant, 3M, had decided to stop manufacturing and selling C-8, based

upon concerns associated with the bio-persistence and toxicity of C-8.

69.     Despite knowledge of the same bio-persistence and toxicity concerns known

to 3M relating to the use of C-8 and its release into the environment and the fact that C-8 was

in public and private human drinking water supplies in the vicinity of the Plant, DuPont's top

corporate management met in 2000 and made the purposeful, intentional, willful, reckless,

wanton, and knowing decision not to stop using C-8 or releasing C-8 into the environment,

and eventually even authorized, approved, and commenced direct manufacture of its own C-8

at a DuPont plant in North Carolina.

70.     By at least June 9, 2000, DuPont was aware that C-8 had been designated by

the American Council of Governmental and Industrial Hygienists (ACGIH) as an A3

carcinogen, meaning "confirmed animal carcinogen."

71.     In the late summer of 2000, as the *Tennant* Case was progressing toward trial,

14

a single document was discovered in the massive amount of documents DuPont had produced in discovery that made a reference to something called "C8" being present in the Dry Run Landfill.

72.    Because DuPont had previously restricted the information it provided in discovery during the *Tennant* Case to materials that were regulated or listed wastes under federal or state laws and regulations, and C-8 was not so regulated or listed at the time, DuPont was asked to immediately begin producing all documents relating to C-8, which DuPont aggressively opposed.

73.    After the federal court in the *Tennant* Case finally ordered DuPont to start turning over all of its C-8 documents to the Plaintiffs, it was discovered that, not only had C-8 been present in the Dry Run Landfill and Dry Run Creek for years, but DuPont had numerous internal documents indicating that C-8 also had been (and presumably still was) present in area drinking water supplies and that DuPont had internal health and safety studies suggesting risks to human health from C-8 exposure, all of which DuPont had purposefully not disclosed.

74.    By the fall of 2000, DuPont understood that the Tennants were now aware of the C-8 contamination at the Dry Run Landfill, in the Dry Run Creek, and in area public water supplies, and that DuPont had been trying to withhold and conceal that information.

75.    In November 2000, one of DuPont's in-house counsel responsible for C-8 issues wrote the following to his co-counsel at DuPont: "I think we need to make more of an effort to get the business to look into what we can do to get the [impacted West Virginia] community a clean source of water to filter the C-8 out of the water. … We are going to spend millions to defend these lawsuits and have the additional threat of punitive damages hanging over our head. Getting out in front and acting responsibly can undercut and reduce the

15

potential for punitives.… Our story is not a good one, we continued to increase our emissions into the river in spite of internal commitments to reduce or eliminate the release of this chemical into the community and the environment because of our concern about the biopersistence of this chemical."

76.      One of DuPont's other in-house counsel responsible for C-8 issues (and DuPont's defense of the *Tennant* Case) also wrote: "The sh[..] is about to hit the fan in WV, the lawyer for the farmer finally realizes the surfactant [C-8] issue …. F[..]k him. Finally the plant realizes it must get public first, something I have been urging for over a year."

77.      Soon thereafter, DuPont authorized its attorneys to seek a gag order from Judge Goodwin in the *Tennant* Case to try to stop one of the Tennants' attorneys involved with uncovering the C-8 drinking water contamination, specifically Robert Bilott with Taft, Stettinius & Hollister, LLP, in Cincinnati, Ohio, from publicly disclosing or addressing the issue with any federal and state environmental protection agencies, but Judge Goodwin denied DuPont's request, allowing the information to belatedly become public.

78.      In response to the federal court's refusal to issue the requested gag order, DuPont's in-house counsel for C-8 issues wrote: "Court yesterday did not agree to shut up plaintiff lawyer in our Parkersburg situation and today he testifies [sic] an EPA hearing. … I told the clients to settle many moons ago. Too bad they still are in denial and don't think things can get worse, wrong again."

79.       On April 8, 2001, DuPont's in-house counsel on C-8 issues described DuPont's C-8 as a material that "we poop to the river and into drinking water along the Ohio River."

80.      On June 14, 2001, DuPont's in-house counsel on C-8 issues wrote that "the

environmental agencies very concerned about what to say when asked if the stuff we are putting into drinking water is 'safe.' We say it is, but are viewed as an interested party (rightly)."

81.    On September 1, 2001, soon after the *Tennant* Case had settled and a new class action lawsuit had been filed in West Virginia state court against DuPont arising from C-8 contamination of drinking water supplies near the Plant, styled *Leach, et al. v E.I. du Pont de Nemours and Co.,* Civil Action No. 01-C-608 (Wood Cty. W. Va. Cir. Ct.) (the "*Leach* Case"), DuPont's in-house counsel on C-8 issues wrote: "I can't blame people if they don't want to drink our chemicals. The compound ... is very persistent in the environment, and on top of that, loves to travel in water and if ingested or breathed wants to stay in the blood, the body thinks it is food, so pulls it from the intestine, the liver then dumps it back to the stomach because it can't break it down, then the intestines puts it right back into the blood."

82.    On October 12, 2001, DuPont's in-house counsel on C-8 issues wrote in connection with C-8 drinking water contamination: "A debacle at best, the business did not want to deal with this issue in the 1990s, and now it is in their face, and some still are clueless. Very poor leadership, the worst I have seen in the face of a serious issue since I have been with DuPont."

83.    On October 13, 2001, DuPont's in-house counsel on C-8 issues wrote with respect to C-8 contamination near the Plant: "[W]e are exceeding the levels we set as our own guideline, mostly because no one bothered to do the air modeling until now, and our water test has [been] completely inadequate. ...I have been telling the business to get out all the bad news, it is nice to see that we are now consulting with lawyers ... that ... are advising the same strategy. Too bad the business wants to hunker down as though everything will not come out in

the litigation, god knows how they could be so clueless, don't they read the paper or go to the movies?"

84.     On October 20, 2001, after analysis of certain water samples from the LPSD indicated C-8 levels less than 1 ppb, DuPont's in-house counsel on C-8 issues wrote: "Now if the clients will only listen to us on doing free testing and giving away bottled water we might avoid punitive damages."

85.     On January 12, 2002, after test results indicated levels of C-8 as high as 7 ppb in water from the LHWA in Ohio, DuPont's in-house counsel on C-8 issues wrote that "in addition to all the agencies we have had on our butts, we now have Ohio and another EPA Region, not to mention the 20,000 people who drink the water supplied by Little Hocking with our surfactant in it, likely it has been there for at least the last decade."

86.     On February 9, 2002, DuPont's in-house counsel on C-8 issues wrote with respect to C-8 contamination: "We should have checked this out long ago, but now our only choice is to share whatever we learn and trying to fix things, best current theory is air deposition from our stacks."

87.     Between late 2001 and 2003, DuPont orchestrated, coordinated, and participated in creative, misleading efforts designed and intended by DuPont to generate a new federal- and/or state-"approved" "screening level" for C-8 in drinking water supplies through creation of a "C-8 Assessment of Toxicity Team" (a/k/a "CAT Team"), which "screening level" would be significantly higher than DuPont's own 1 ppb CEG and would be held out by DuPont to the public, including Plaintiff-decedent, as proving the lack of any health risk or safety concerns with respect to the level of C-8 in drinking water supplies near the Plant.

88.     After the CAT Team announced in the Spring of 2002 a new "screening level"

for C-8 in drinking water of 150 ppb – *150 times higher* than the 1 ppb CEG DuPont *still* uses

to this day – DuPont actively and repeatedly cited that screening level in communications

intended for dissemination to the public, including to Plaintiff-decedent, that such screening

level proved that the levels of C-8 in drinking water near the Plant were all perfectly "safe" and

posed no risk of harm or injury to anyone.

89.     In March of 2002, the Director of DuPont's Haskell Laboratory for Health &

Environmental Sciences falsely and misleadingly represented to a Charleston, West Virginia

newspaper in a letter intended for dissemination to the public, including Plaintiff-decedent, that

there is "an extensive database on C-8 …that indicate no known adverse human health impact

associated with current or historic use of C-8," "there are no known adverse health effects

associated with C-8 in humans or the environment," that "[a]ll of this information has been

provided to both state and federal regulators," and "the importance of communicating accurate

information in its proper context – especially in areas as complex as human and environmental

health – should be of the highest priority in serving the public interest."

90.     In May of 2002, the Plant's Plant Manager falsely and misleadingly

represented in a press release intended for dissemination to the public, including Plaintiff-

decedent, that "the presence of C-8 at the low levels detected to-date in drinking water in the

Mid-Ohio Valley is not harmful."

91.     During the *Leach* Case class action litigation against DuPont involving the

contaminated drinking water supplies near the Plant, the West Virginia state court overseeing

that litigation found that documents relating to how the screening level had been developed

and DuPont's involvement with those activities had been wrongfully withheld and destroyed.

92.     The *Leach* Case court also found that DuPont's lead C-8 toxicologist and

representative on the CAT Team had inappropriately and wrongfully destroyed C-8 documents, and that DuPont should be sanctioned for its discovery abuses and attempts to delay and withhold production of C-8 documents in that case.

93.     Beginning by at least 2003, DuPont paid various consultants, including The Weinberg Group, many thousands of dollars to help implement a comprehensive strategy purposefully designed to attack and to attempt to discredit those who alleged adverse health effects from C-8, to prevent third parties from "connecting the dots" between DuPont and C-8 problems, to coordinate media and third-party communications, and to thwart any C-8-related litigation, which strategy DuPont later modified into its "Clean Hardball" plan, and which strategy later became the subject of a Congressional investigation.

94.     In February of 2003, the Plant's Plant Manager falsely and misleadingly represented in various statements provided to various media representatives, including a Columbus, Ohio, newspaper, which were intended for public dissemination, including to Plaintiff, that, "[i]n more than 50 years of C-8 use by DuPont and others, there have been no known adverse human health effects associated with the chemical," that "all" of the available scientific research "has been provided to both state and federal regulators," that "epidemiological studies of workers do not indicate an increased risk of cancer associated with exposure to C8," that "DuPont has made significant efforts to respond to the public honestly and openly with correct information about C8, and that "the use of C8 at the Washington Works site has not posed a risk to either human health or the environment."

95.     During a "media update" provided by DuPont in March of 2003, various representatives of DuPont, including the Plant Manager and the Director of DuPont's Haskell Laboratory for Health and Environmental Sciences, falsely and misleading represented

through documents and statements intended for dissemination to the public, including

Plaintiff-decedent, that "there are no health effects associated with C-8 exposure," "C-8 is not

a human health issue," "in more than 50 years of C8 use by DuPont and others, there have

been no known adverse human health effects associated with C8," and that DuPont "know[s]

for a fact that there have been no observed adverse health effects among 3M and DuPont

employees who have worked with C8."

       96.     Later in March 2003, DuPont's Vice President and General Manager –

DuPont Fluoroproducts, falsely and misleading represented in a press release intended for

dissemination to the public, including Plaintiff-decedent, that C-8 "has been wrongfully

represented as a health risk when, in fact, it has been used safely for more than 50 years with

no known adverse effects to human health," that "[t]here is no evidence or data that

demonstrates [C-8] causes adverse human health effects," that "the compound is safe for all

segments of the population, including women of child-bearing age and young girls," and that

"[t]here is extensive scientific data, including worker surveillance data, peer-reviewed

toxicology and epidemiology studies, and expert panel reports that support this position."

       97.     In April of 2003, the Director of DuPont's Haskell Laboratory for Health

and Environmental Sciences falsely and misleading represented in a press release intended

for dissemination to the public, including Plaintiff-decedent, that "[t]here is no evidence or

data that demonstrates [C-8] causes adverse human health effects, including developmental

or reproductive effects, in any segment of the human population."

       98.     In April of 2003, DuPont's Vice President and General Manager for DuPont

Fluoroproducts falsely and misleadingly represented in a press release intended for public

dissemination, including to Plaintiff-decedent, that "our use of [C-8] over the past 50 years has

not posed a risk to either human health or the environment."

99.     In April of 2003, DuPont's spokesperson for the Plant falsely and
misleadingly represented in a written statement provided to media outlets, including West
Virginia public radio, which statement was intended for dissemination to the public, including
Plaintiff-decedent, that DuPont's "use of [C-8] over the past 50 years has not posed a risk to
either human health or the environment" and that "[t]here is no evidence to support a finding
that the public or the [*Leach* Case] class has been subjected to adverse health risks from
exposure to [C-8] at the levels observed."

100.    In April 2003, DuPont's CEO falsely and misleadingly represented during a
DuPont annual shareholder meeting through statements intended for dissemination to the
public, including Plaintiff-decedent, that DuPont has "not seen any negative impacts on human
health or impact to the environment at the exposure levels that we operate" with respect to
DuPont's use of C-8.

101.    In May 2003, DuPont falsely and misleadingly represented in a press release
issued by DuPont and intended for dissemination to the public, including Plaintiff-decedent,
that "there is no scientific evidence to support [the *Leach* Court's] conclusions that the
plaintiffs' claims are warranted. In fact, the scientific data overwhelmingly establishes that C-8
is not a human health hazard," that "[n]othing in DuPont's 50 years of experience with C-8
indicates it is a hazard and nothing in the toxicity testing for C-8 suggests the class members
are at any risk whatsoever," and that Class Counsel for the plaintiffs in the *Leach* Case were
creating "unjustifiable health concerns" that are "a disservice to the people of the Mid-Ohio
Valley" by suggesting that there are potential health risks from their C-8 exposure.

102.    In written information posted by DuPont in late 2003 on a website created for

the Plant under the heading "Quick C-8 Facts," which was intended by DuPont for dissemination to the public, including Plaintiff-decedent, DuPont falsely and misleadingly represented that "available epidemiologic studies of workers do not show an increased risk of cancer associated with exposure to C-8."

103.    In May of 2004, DuPont's lead in-house toxicologist for C-8 falsely and misleadingly represented in a press release intended for dissemination to the public, including Plaintiff-decedent, that C-8 "is not a human carcinogen and there are no known health effects associated with" C-8 and that recent reports of a new study suggesting an increased rate of cancer among *Leach* Case class members "are inaccurate and inconsistent with published scientific studies," and represent "an example of unscientific reporting and alarmist media coverage that does a disservice to our employees and the community in which they live."

104.    Later in 2004, EPA filed a complaint against DuPont noting violations of the federal Resource Conservation and Recovery Act ("RCRA") and Toxic Substances Control Act ("TSCA") requirements and statutory duties with respect to DuPont's failure to disclose C-8 toxicity and exposure information to USEPA that it should have disclosed beginning in at least the early 1980s (the "EPA Action"), adding additional counts through a later complaint relating to DuPont's failure to disclose data earlier produced to DuPont by the Tennants' attorneys indicating that the presence of C-8 in local drinking water supplies resulted in elevated levels of C-8 in the blood of those drinking such water.

105.    In July of 2004, DuPont falsely and misleadingly represented in a press release intended for dissemination to the public, including Plaintiff-decedent, that C-8 "is not hazardous to human health" and that media reports to the contrary were a "misinterpretation

23

and misunderstanding" of the facts.

106.     In August of 2004, DuPont's General Counsel falsely and misleadingly represented in a DuPont press release created and intended for dissemination to the public, including Plaintiff-decedent, that the CAT Team's 150 ppb screening level was "EPA's safety guidance for drinking water" and, in talking points made available to the public, including Plaintiff-decedent, linked directly though that same press release attributed to DuPont's General Counsel, DuPont made the false and misleading representations that "[t]here is no scientific evidence that low levels of exposure to [C-8] cause adverse human health effects in any segment of the population" and that there are "no known adverse health effects or environmental effects" from C-8 exposure.

107.     DuPont eventually settled the EPA Action by agreeing to pay over $16 million in civil administrative penalties and supplemental environmental projects, which USEPA characterized as the "largest civil administrative penalty EPA has ever obtained under any federal environmental statute."

108.     In January 2005, DuPont falsely and misleadingly represented though a press release intended for dissemination to the public, including Plaintiff-decedent, that its own study of Plant workers had confirmed that there are "[t]o date, no human health effects known to be caused by" C-8, even though the same study showed that Plant workers with higher levels of C-8 exposure had higher levels of cholesterol.

109.     On January 11, 2005, DuPont publicly disclosed that it had been served with a subpoena by the U.S. Department of Justice's Environmental Crimes Section seeking C-8 information.

110.     In July of 2005, DuPont falsely and misleadingly represented in a Media

24

Advisory intended for dissemination to the public, including Plaintiff-decedent, that C-8 "exposure does not pose a cancer risk or any health risk to the general public."

111.     In January 2006, DuPont became aware that USEPA's Science Advisory Board had approved the recommendation of its independent PFOA Review Panel that C-8 be classified as a "likely" human carcinogen.

112.     In January 2006, the Director of DuPont's Haskell Laboratory for Health & Environmental Sciences falsely and misleadingly represented in a press release intended for dissemination to the public, including Plaintiff-decedent, that "in 50 years of working with [C-8], there is no association of cancer in workers who handle or use" C-8.

113.     In February 2006, DuPont's own Epidemiology Review Board ("ERB") cautioned DuPont to stop its repeated and intentional practice of stating to the public through press releases, website postings, and other forms of communication directed to the public that there are no adverse health effects associated with human exposure to C-8, noting that recent scientific developments provide sufficient data to "question the evidential basis of DuPont's public expression asserting that [C-8] does not pose a risk to health."

114.     In October of 2006, in direct opposition and defiance of its own ERB's advice, DuPont's Medical Director falsely and misleadingly represented in a press release intended for dissemination to the public, including Plaintiff-decedent, upon release of a DuPont internal study of death rates among its Plant workers due to various causes, including cancer, that "there are no human health effects known to be caused by [C-8]."

115.     In March of 2009, DuPont reviewed and approved issuance of a press release by one of its consultants, the Sapphire Group, that DuPont intended be distributed in a way that Plaintiff-decedent and the public would see it and be misled, which boldly proclaims that

the C-8 in Plaintiff's water is perfectly "safe," exactly as DuPont's own ERB cautioned DuPont *not* to do.

116.    C-8 is a bioretentive substance in the sense that it is retained in the blood and/or tissues of living organisms, including humans, exposed to the chemical over time.

117.    C-8 is a bioaccumulative substance in the sense that the levels of the chemical will build up and/or accumulate to higher levels in the blood and/or tissues of living organisms, including humans, exposed to the chemical over time.

118.    C-8 is a biopersistent substance in the sense that the chemical will tend to remain present over time in environmental media where it is released and/or comes to be located.

119.    C-8 is a hazardous substance, hazardous waste, solid waste, toxin, carcinogen, pollutant, and/or contaminant.

120.    C-8 poses a risk to human health at a concentration of less than 1 ppb in water.

121.    DuPont has not entered into any enforceable agreement that requires it to discontinue the use, release, or emission of all C-8 at or from the Plant at any time in the future.

122.    DuPont did not seek permission from Plaintiff-decedent to put or allow any amount of C-8 in Plaintiff-decedent's drinking water.

123.    Plaintiff-decedent did not give DuPont permission to put or allow any amount of C-8 in Plaintiff-decedent's drinking water.

124.    DuPont did not seek permission from Plaintiff-decedent to put or allow any amount of C-8 in Plaintiff-decedent's blood/serum/body.

125.    Plaintiff-decedent did not give DuPont permission to put or allow any

amount of C-8 in Plaintiff-decedent's blood/serum/body.

126.    Plaintiff-decedent and/or a normal, reasonable person living in Plaintiff-decedent's community is and/or was reasonably concerned and fearful of the C-8 in their groundwater, drinking water, and/or bodies/blood, and reasonably finds/found such contamination offensive, unreasonable, annoying and/or intolerable.

127.    At all times relevant hereto, DuPont negligently, willfully, wantonly, recklessly, carelessly, wrongfully, and/or intentionally failed to disclose to the individuals who were using the public and/or private water from the West Virginia and Ohio water supplies where DuPont's sampling had found C-8 that C-8 was in such water and that the levels of C-8 detected in the water exceeded DuPont's own internal CEG for C-8 in drinking water.

128.    At all times relevant hereto, DuPont was aware that the analytical methods it was using to analyze human drinking water samples for C-8 often had poor surrogate recovery rates and/or other deficiencies, such as absorption to glass, that indicated to DuPont that the actual levels of C-8 in the water being analyzed were likely even higher than the levels of C-8 being reported by such methods, but DuPont negligently, recklessly, carelessly, wrongfully, and/or intentionally misrepresented, failed to disclose, and/or purposefully withheld and/or concealed such information from those individuals likely to consume the water.

129.    At all times relevant hereto, DuPont, negligently, willfully, wantonly, recklessly, carelessly, wrongfully, and/or intentionally selected particular analytical methods, sampling techniques, and/or data reporting strategies so as to generate false, incomplete, and/or misleading C-8 water sampling data results that were artificially low and/or otherwise not accurately representative of the true nature of C-8 levels in the environmental media being analyzed.

130.     Once it knew that C-8 was present in human drinking water supplies near
its Washington Works Plant, including levels above its own 1 ppb CEG, DuPont prepared
media statements and press releases to disclose and address the C-8 contamination but then,
with the knowledge and approval of top corporate management, negligently, recklessly,
carelessly, wrongfully, and/or intentionally withheld that information from the individuals
consuming the C- 8 contaminated drinking water for, among other reasons, a corporate
desire not to negatively impact corporate profits and/or other economic interests.

131.     Although DuPont was aware by at least the 1980s of various technologies
that could reduce the amount of C-8 being emitted into the air or into water from its
Washington Works Plant, such as scrubbers for plant stacks and carbon absorption water
treatment systems, DuPont negligently, recklessly, carelessly, wrongfully, and/or
intentionally refused to fully install and/or implement such available technologies for decades
for, among other reasons, a corporate desire not to negatively impact corporate profits and/or
other economic interests.

132.     DuPont took steps to purposely and intentionally conceal from the public the
fact that C-8 was detected in the human drinking water supplies at levels exceeding DuPont's
1 ppb CEG for C-8 in drinking water, including purposeful and/or intentional omissions of any
reference to such test results when specifically asked about C-8 levels by members of the
media or government and in a letter co-drafted by DuPont and LPSD, which LPSD then sent
to its water customers, dated October 31, 2000.

133.     At all times relevant hereto, DuPont has encouraged the publication and public
dissemination by DuPont-employed and/or -funded scientists, employees, agents, and/or
consultants of toxicity and health data purposefully, intentionally, willfully, wantonly,

recklessly and/or negligently designed to inaccurately, artificially, and/or misleadingly minimize potential and/or actual negative C-8 human health effects and/or risks and to discredit and/or otherwise negatively affect those who suggest or state that such potential and/or actual negative C-8 human health effects and/or risk exist.

134.    At all times relevant hereto, DuPont management repeatedly and consistently rejected the recommendations of its own scientists and outside advisors, including its own in- house epidemiologists, to pursue appropriate investigations of C-8 health effects, failed to maintain appropriate records of those health effects and claims, and refused to allow results showing adverse effects to be documented, published, or accurately disclosed.

135.    At no time since C-8 was first detected in Plaintiff-decedent's drinking water has DuPont disclosed to or advised the public, including Plaintiff-decedent, that C-8 was or is present in such water at any level presenting a risk of harm or injury.

136.    Since the time that C-8 was first detected in Plaintiff-decedent's drinking water, DuPont has knowingly, willfully, wantonly, recklessly, intentionally, and consistently misrepresented and/or assisted, coordinated, or otherwise encouraged others to misrepresent to the public, including Plaintiff-decedent, that the C-8 present in such water will not cause any harm or injury or present any meaningfully increased risk of such harm or injury, and has consistently falsely denied that such C-8 water contamination could give rise to any existing or potential personal injury of any kind for anyone drinking any amount of such water.

137.    DuPont has known for several decades that the discharge of C-8 into the Ohio River from its Washington Works Plant is contributing to the levels of C-8 present in human water supplies.

138.     DuPont has known for several decades that the level of C-8 discharged from its Washington Works Plant into the Ohio River could be reduced substantially by use of a carbon absorption treatment system at the Washington Works Plant.

139.     It was not until the Spring of 2001, after the West Virginia Division for Environmental Protection ("WVDEP") first demanded that DuPont begin monitoring and reporting to WVDEP the levels of C-8 discharged from DuPont's Washington Works Plant into the Ohio River, that DuPont installed a carbon absorption treatment system at its Washington Works Plant to attempt to begin reducing the levels of C-8 discharged directly from the Washington Works Plant into the Ohio River.

140.     In 2004, DuPont entered into a Class Action Settlement Agreement in the *Leach* Case, which was approved by the Court in 2005 following appropriate notice and a fairness hearing (the "*Leach* Settlement").

141.     DuPont did not offer or provide for, and actively opposed and rebuffed, any treatment or abatement of C-8 levels in any private or public human drinking water supply in Ohio or West Virginia prior to being required to do so under the terms of the *Leach* Settlement.

142.      Under the *Leach* Settlement, certain individual personal injury, wrongful death, and punitive damages claims of the *Leach* Class Members relating to the contamination of their drinking water with C-8 attributable to the Plant (the "Individual Injury Claims") were stayed and preserved (and all potentially applicable statutes of limitations would continue to be tolled), pending a determination by a new "C8 Science Panel" jointly selected by DuPont and Plaintiffs' Class Counsel and funded by DuPont as to whether there is any "Probable Link" between C-8 exposure of the Class Members and any Human Disease(s), as such terms

are defined in the *Leach* Settlement.

143.     The C8 Science Panel ultimately determined that a "Probable Link" exists between C-8 exposure among *Leach* Class Members and the following human diseases: 1) kidney cancer; 2) testicular cancer; 3) ulcerative colitis; 4) thyroid disease; 5) pregnancy-induced hypertension/preeclampsia; and 6) medically-diagnosed high cholesterol (the "Linked Diseases"), all documented by the C8 Science Panel in a series of reports the last of which was released in October of 2012.

144.     In December of 2011, after the C8 Science Panel released its "Probable Link Finding" for pregnancy-induced hypertension/preeclampsia, DuPont's Plant Manager represented in a statement released to the media, including the Parkersburg News & Sentinel, which DuPont intended be disseminated to the public, including Plaintiff, that DuPont "does not believe that [C-8] causes pregnancy-induced hypertension."

145.     Because the C-8 Science Panel was not required to release to DuPont and the *Leach* Case class members its underlying data package until late in January of 2013, DuPont has agreed that the running of any statute of limitations applicable to *Leach* Class Members' Individual Injury Claims not otherwise released or dismissed under that Settlement will continue to be deemed tolled from August 30, 2001, through January 28, 2013.

146.     Under the *Leach* Settlement, DuPont agreed for the purposes of any Individual Injury Claims of *Leach* Class Members that DuPont will not contest the issue of general causation (meaning whether it is probable that exposure to C-8 is capable of causing a particular human disease) between C-8 and any Linked Diseases.

147.     *Leach* Class Members are defined under the *Leach* Settlement to include certain individuals who consumed for at least one year prior to December 3, 2004, C-8

contaminated drinking water from one or more drinking water sources specified in that Settlement and who did not opt-out or otherwise waive their rights under that Settlement.

148.     Plaintiff-decedent is as a *Leach* Class Member and suffered from one or more of the Linked Diseases, including being diagnosed with kidney cancer and subsequently dying as a result of his kidney cancer within two years prior to the filing of this complaint.

149.     DuPont's negligent acts and/or omissions directly and proximately caused and/or continue to directly and proximately cause damage to Plaintiff-decedent in the form of bodily injury, death and economic damage for which DuPont is liable, including one or more Linked Diseases, as a direct and proximate result of DuPont's negligent acts and/or omissions, Plaintiff is also reasonably certain to have future permanent and lasting detrimental emotional effects due to Plaintiff-decedent's present and past injuries directly and proximately caused by DuPont's negligent acts and/or omissions.

150.     The Releases (as described throughout this complaint) have made and/or continue to make Plaintiff-decedent physically ill and otherwise physically harmed, including death and/or have caused and/or continue to cause Plaintiff associated emotional and mental stress, and anxiety.

151.     Plaintiff files this lawsuit within the applicable limitations period.

## FIRST COUNT

## NEGLIGENCE

152.     Plaintiff incorporates herein by reference each and every paragraph of this Complaint as though set forth in full in this cause of action.

153.     In connection with its operation of the Plant, DuPont has had and continues to have a general duty of care and/or duty to operate and manage the Plant in such a way as to not create a nuisance or condition causing any injury or damage to human health or the environment.

154.     In addition to DuPont's general duty of care and/or duty to operate and manage the Plant in such a way as to not create a nuisance or condition causing any injury or damage to human health or the environment, DuPont also voluntarily assumed a duty towards Plaintiff-decedent, other exposed individuals, and the public at large by affirmatively representing to Plaintiff-decedent, other exposed individuals, and the public at large that the Releases and DuPont's previously detailed acts and/or omissions were not causing any physical harm or other damage to them, and that the contaminated drinking water was safe to consume.

155.     C-8 is an inherently dangerous substance, and DuPont owed a duty of care towards Plaintiff-decedent, other exposed individuals, and the public at large that was commensurate with C-8's harmful nature and the dangers involved with exposure to C-8.

156.     DuPont breached one or more of its duties of care by negligently operating and/or managing the Plant and/or conducting other operations and activities at the Plant in such a manner as to negligently cause, permit, and/or allow the Releases, thereby contaminating the drinking water and blood/body of Plaintiff-decedent, and also by knowingly making false representations and/or knowingly concealing material information from Plaintiff-decedent, other exposed individuals, and the public at large regarding the Releases, the contaminated drinking water, and Plaintiff-decedent's harmful exposure to C-8.

157.     Despite knowing the harmful effects of C-8 exposure and the Releases, DuPont failed to properly minimize, abate, and/or treat the Releases, failed to properly notify the public or government officials of the ongoing Releases, and despite knowing the harmful effects of C-8 exposure and the Releases, and despite knowing that the contaminated drinking water was unhealthy to consume because of its C-8 contamination, DuPont failed to correct, clarify, rescind, and/or qualify its representations to Plaintiff-decedent, other exposed individuals, and

the public at large that the Releases and DuPont's acts and/or omissions were not causing any physical harm and/or damage to them, or that the contaminated drinking water was safe to consume.

158.    But for DuPont's negligent acts and/or omissions, Plaintiff-decedent would not have consumed and/or been exposed to unhealthy levels of C-8, and/or would not have continued to consume the contaminated drinking water.

159.    DuPont's negligent acts and/or omissions directly and proximately caused and/or continue to directly and proximately cause damage to Plaintiff-decedent in the form of bodily injury, death and economic damage for which DuPont is liable, including kidney cancer and death, as a direct and proximate result of DuPont's negligent acts and/or omissions, and Plaintiff is also reasonably certain to have future permanent and lasting detrimental health effects due to Plaintiff-decedent's past injuries directly and proximately caused by DuPont's negligent acts and/or omissions.

160.    It has been reasonably foreseeable to DuPont for at least several decades that DuPont's negligent acts and/or omissions would directly and proximately cause bodily injury and economic damage to Plaintiff-decedent, other exposed individuals, and the public at large, including the injuries and damages that Plaintiff-decedent suffered from.

161.    DuPont was conscious of the Releases and its negligent acts and/or omissions, and was conscious that bodily injury to Plaintiff-decedent, other exposed individuals, and the public at large would and/or was likely/probable to result from the Releases and DuPont's negligent acts and/or omissions.  Nonetheless, with reckless indifference to these consequences, and as previously detailed, DuPont consciously and intentionally acted negligently and/or omitted the duties DuPont knew it owed to Plaintiff-decedent, other exposed individuals, and the

public at large, and Plaintiff-decedent was directly and proximately harmed as a result.

162.    The aforesaid acts and/or omissions of DuPont were negligent, intentional, reckless, malicious, willful and/or wanton, and as a direct and proximate result Plaintiff and Plaintiff-decedent, other exposed individuals, and the public at large have suffered and will in the future suffer some or all of the following damages:

(a)    Medical and hospital bills for diagnosis, monitoring, and treatment of injuries;

(b)    Physical injury, both temporary and permanent;

(c)    Economic damages;

(d)    Severe and significant emotional distress and mental pain and suffering;

(e)    Humiliation, embarrassment and fear;

(f)    Loss of enjoyment of life;

(g)    Annoyance and inconvenience; and

(h)    Other damages, which, under the law and circumstances, Plaintiff is entitled to recover, including attorneys' fees and costs associated with the prosecution of this action.

## SECOND COUNT

## CONCEALMENT, MISREPRESENTATION AND FRAUD

163.    Plaintiff incorporates herein by reference each and every paragraph of this Complaint as though set forth in full in this cause of action.

164.    DuPont knowingly, intentionally, maliciously, willfully, wantonly, recklessly and/or negligently failed and/or refused to advise Plaintiff-decedent, other exposed individuals, and the public at large of the dangers and/or risks to their health posed by the Releases.

165.    DuPont negligently, knowingly, maliciously, willfully, wantonly, recklessly intentionally and/or negligently withheld, misrepresented, and/or concealed information regarding the Releases from Plaintiff-decedent, other exposed individuals, and the public at large who had a right to know of information which would have prevented Plaintiff-decedent, other exposed individuals, and the public at large from being exposed and/or continuing to be exposed to the Releases.

166.    For at least several decades, DuPont has had knowledge and/or the means of knowledge that the Releases and C-8 were causally connected with and/or could increase the risk of causing damage to humans and animals, including knowledge of statistically significant findings showing a causal connection between exposure to C-8 and physical injuries in humans and animals.

167.    In connection with its operation of the Plant, DuPont has had and continues to have a general duty of care to disclose to Plaintiff and/or Plaintiff-decedent, other exposed individuals, and the public at large the actual and potential harm to their persons as a direct and proximate result of DuPont's acts and/or omissions, including a general duty of care to disclose to Plaintiff-decedent and/or Plaintiff, other exposed individuals, and the public at large that DuPont's Releases had, and were continuingly, exposing Plaintiff and/or Plaintiff-decedent, other exposed individuals, and the public at large to harmful levels of C-8.

168.    In addition to its general duty of care, DuPont also voluntarily assumed a duty to disclose to Plaintiff-decedent, other exposed individuals, and the public at large the actual and potential harm to their persons as a direct and proximate result DuPont's acts and/or omissions, including (as indicated in the Article) a duty to disclose to Plaintiff-decedent, other exposed individuals, and the public at large that DuPont's Releases had exposed, and were

continuingly exposing Plaintiff-decedent, other exposed individuals, and the public at large to

harmful levels of C-8, which duty was voluntarily assumed by affirmatively representing to

Plaintiff-decedent, other exposed individuals, and the public at large that the Releases and their

C-8 exposure were harmless, when DuPont knew and/or reasonably should have known that

the Releases and C-8 exposure had caused, and were continuing to cause, bodily injury.

169.    Through its superior knowledge, responsibility, and/or control over the

Releases, and its voluntary actions and/or representations, a relationship of trust and

confidence existed between DuPont and Plaintiff-decedent, other exposed individuals, and the

public at large.

170.    Despite DuPont's knowledge regarding the Releases and C-8 exposure, and

despite DuPont's duties to disclose to Plaintiff-decedent, other exposed individuals, and the

public at large, DuPont negligently, maliciously, knowingly, willfully, wantonly, recklessly

and/or intentionally withheld, misrepresented, and/or concealed information from Plaintiff-

decedent, other exposed individuals, and the public at large regarding the Releases and C-8

exposure.

171.    DuPont withheld, misrepresented, and/or concealed information regarding the

Releases and C-8 exposure from Plaintiff-decedent, other exposed individuals, and the public

at large with the intention to mislead and/or defraud them into believing that their C-8

exposure was not harmful, and to mislead and/or defraud them into continuing to purchase and

consume drinking water contaminated with C-8.

172.    Plaintiff-decedent did not have sufficient information to determine the safety of

the contaminated drinking water impacted by the Releases and, therefore, justifiably relied

upon the superior knowledge of DuPont in deciding to purchase and ingest the contaminated

drinking water, and, as a direct and proximate result of Plaintiff-decedent's justified reliance on DuPont's false and misleading affirmative misrepresentations and intentional omissions and/or concealment of relevant, significant, and material facts and information, Plaintiff-decedent was misled into believing the contaminated drinking water was safe and effective for human consumption, and continued to purchase and consume such drinking water contaminated with C-8, directly and proximately causing harm to Plaintiff and Plaintiff-decedent as described herein.

173.     DuPont withheld, misrepresented, and/or concealed information which it had in its possession concerning research, testing, lack of research and testing, and/or studies of humans and animals who had been exposed to C-8 that demonstrated that C-8 might cause and/or increase the risk of causing damage to humans and animals, as well as other information that medically, legally, scientifically, and/or ethically Plaintiff-decedent had a right to know before ingesting the drinking water and which DuPont had a duty to disclose.

174.     As a direct and proximate result of the aforesaid acts and/or omissions by DuPont, acting for and on its own behalf and as agent, ostensible agent, employee, conspirator and/or joint venturer of others, contaminated drinking water was placed in the stream of commerce, distributed and sold to customers in West Virginia, and ingested by Plaintiff-decedent, other exposed individuals, and the public at large, and Plaintiff-decedent was injured as herein alleged.

175.     DuPont not only withheld, misrepresented, and/or concealed information from Plaintiff-decedent, other exposed individuals, and the public at large, but also committed fraud against Plaintiff-decedent and such others by affirmatively representing to Plaintiff-decedent, other exposed individuals, and the public at large that the Releases and their C-8 exposure were

38

harmless and/or did not present any risk of harm, when DuPont knew and/or reasonably should have known that DuPont's Releases and C-8 pollution had caused, and were continuing to cause, bodily injury and/or risk of such bodily injury to Plaintiff-decedent and such others.

176.     DuPont's representations to Plaintiff-decedent, other exposed individuals, and the public at large were knowingly, intentionally, negligently, and/or recklessly false.

177.     DuPont had, and continues to have, a duty of care to provide Plaintiff-decedent, other exposed individuals, and the public at large with truthful representations regarding the Releases and the actual and potential harm to their persons as a direct and proximate result of DuPont's acts and/or omissions, and DuPont voluntarily assumed a duty of care to provide Plaintiff-decedent, other exposed individuals, and the public at large with truthful representations regarding the Releases and the actual and potential harm to their persons as a direct and proximate result of DuPont's acts and/or omissions.

178.     DuPont's affirmative representations and/or omissions to Plaintiff-decedent, other exposed individuals, and the public at large were false and were material to Plaintiff-decedent, other exposed individuals, and the public at large, in forming their belief that the drinking water was safe and effective for human consumption, in causing them to continue to purchase and consume such drinking water contaminated with C-8, and in causing them to not seek treatment and/or ways to remedy their past and continuing exposure to C-8.

179.     DuPont made the affirmative representations and/or omissions to Plaintiff-decedent, other exposed individuals, and the public at large with the intention that Plaintiff-decedent, other exposed individuals, and the public at large would be misled into relying on such affirmative representations and/or omissions.

180.     Plaintiff-decedent, other exposed individuals, and the public at large relied on